**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION**

| | | |
|---|---|---|
| Nutramax Laboratories, Inc., | ) | Civil Action No. 0:17-cv-01924-JMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **FINDINGS OF FACT, CONCLUSIONS** |
| | ) | **OF LAW, AND ORDER AND OPINION** |
| Nutra Max Labs Inc, and Namecheap, Inc. | ) | **GRANTING MOTION FOR** |
| d/b/a WhoisGuard, | ) | **PRELIMINARY INJUNCTION**[1] |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff Nutramax Laboratories, Inc. ("Nutramax" and/or "Plaintiff") filed this action against Defendants Nutra Max Labs Inc ("NMLI" and/or "Defendant") and Namecheap, Inc. d/b/a WhoisGuard ("Namecheap") (together "Defendants") alleging claims of infringement on its registered trademark/intellectual property. (ECF No. 1.)

This matter is before the court on Nutramax's unopposed Motion for Preliminary Injunction. (ECF No. 8.) After full consideration of Nutramax's Motion, Verified Complaint and all other matters presented, the court **GRANTS** Nutramax's Motion for Preliminary Injunction.

### I. FINDINGS OF FACT RELEVANT TO PENDING MOTION

1. Nutramax researches, markets, distributes, and sells "high quality nutritional supplement products for use by humans and animals throughout the United States and internationally, under its trademarked name, NUTRAMAX LABORATORIES®." (ECF No. 1

---

[1] Rule 52 of the Federal Rules of Civil Procedure requires the court to "state the findings and conclusions that support" the "granting or refusing [of] an interlocutory injunction." Fed. R. Civ. P. 52(a)(2). To the extent any findings of fact constitute conclusions of law, they are adopted as such; to the extent any conclusions of law constitute findings of fact, they are so adopted.

at 1 ¶ 1.)

2. "Nutramax uses, owns, and has registered on the Principal Register of the United States Patent and Trademark Office the following mark relevant to this action (the "Mark"):

| MARK | REG. NO. | REG. DATE | CLASS/GOODS |
|---|---|---|---|
| Nutramax Laboratories | 2231260 | March 16, 1999 | Dietary food supplements" |

(ECF No. 1 at 4 ¶ 18 (referencing ECF No. 18-2 at 1).)

3. NMLI also "manufactures, markets, and distributes 'natural' supplements . . . through the website www.nutramax-labs-inc.com (the "Infringing Website")." (Id. at 1 ¶ 2.) Two of NMLI's products are at issue in this matter: "'Steelcut Testosterone' and 'Muscle Boost XT,' which both purport to 'not only result in improved muscle growth, but also improve[] many factions of the human body which lead to better muscle building,' through the Infringing Website." (Id.)

4. NMLI "offers 'free' trials" of "Steelcut Testosterone" and "Muscle Boost XT" and "represents that it will not charge the consumer the full bottle price until the trial period has expired." (Id. at 2 ¶ 3.)

5. "But consumers across the country complain that Defendant [NMLI] charges the approximately $95 full bottle price before the expiration of the trial period, and also complain that they are unable to obtain a refund or cancel the recurring monthly subscription that follows." (Id.)

6. "Bottles of Steelcut Testosterone and Muscle Boost XT contain contact information for 'Nutra Max Labs Incorporated, P.O. [Box] 23793, St. Petersburg, FL 33742' and direct consumers to the Infringing Website, but do not contain a phone number to contact the manufacturer." (Id. ¶ 5.)

7. NMLI "employs various iterations of the Plaintiff Nutramax's name and the Mark, as defined herein, on its Infringing Website." (Id.) "Thus, when consumers are dissatisfied with their Steelcut Testosterone or Muscle Boost XT products, they research 'Nutra Max' or 'Nutramax' and are directed to Plaintiff Nutramax's customer service department." (Id.)

8. As a result of the foregoing, consumers are fraudulently led to believe that Plaintiff Nutramax is the perpetrator of the scam.

9. "Consumers mistakenly believe that Plaintiff Nutramax sells the Products on the Infringing Website and is the entity behind this scam." (Id. at 7 ¶ 37.)

10. NMLI "is using Nutramax's registered Mark to carry out this scam and to capitalize and profit on it to the detriment of Nutramax." (Id. at ¶ 39.)

11. On July 20, 2017, Nutramax filed a Verified Complaint alleging claims against NMLI for trademark infringement, trademark dilution, false designation of origin, common law fraud, violation of the South Carolina Unfair Trade Practices Act, and for preliminary and permanent injunction. (ECF No. 1 at 8 ¶ 42–10 ¶ 55 & 11¶ 64–13 ¶ 84.)

12. Additionally, Nutramax alleged a claim against Defendants for violation of the Anti-Cybersquatting Consumer Protection Act ("ACPA"). (Id. at 10 ¶ 56–11 ¶ 63.)

13. Thereafter, Nutramax filed a Motion for Preliminary Injunction (ECF No. 8) on July 26, 2017, and a Motion to Expedite Hearing on the Motion for Preliminary Injunction on July 28, 2017.[2] (ECF No. 11.)

14. Nutramax served its Motion for Preliminary Injunction on Defendants on July 27, 2017. (ECF No. 9.)

---

[2] The court observes that Nutramax's Motion to Expedite Hearing (ECF No. 11) was granted by Text Order on September 20, 2017. (ECF No. 20.)

15. Nutramax and Namecheap resolved their dispute by stipulation on August 21, 2017. (ECF No. 15.) "Namecheap [] agreed to promptly transfer the Domain [nutramax-labs-inc.com] into Nutramax's possession upon being presented with either an Order from this Court, or a fully executed written agreement between Nutramax and the registered user of the Domain, directing such action." (Id. at 1 ¶ 4.)

16. Nutramax served a Notice of Hearing on NMLI regarding the Motion for Preliminary Injunction on September 21, 2017. (ECF No. 31-1.)

17. On October 10, 2017, the court held a hearing on Nutramax's Motion for Preliminary Injunction. (ECF No. 32.) NMLI did not appear at the October 10, 2017 hearing.

## II.   LEGAL STANDARD AND ANALYSIS

A.   Preliminary Injunctions Generally

18. The court's authority to issue a preliminary injunction arises from Rule 65,[3] but "it is an extraordinary remedy never awarded as of right." Winter v. Nat'l Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). A party seeking a preliminary injunction must establish all four of the following elements: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. Id.; The Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346–47 (4th Cir. 2009).

19. The Fourth Circuit no longer recognizes a "flexible interplay among the four criteria for a preliminary injunction." Real Truth, 575 F.3d at 347. Each of these requirements "must be fulfilled as articulated." De la Fuente v. S.C. Dem. Party, CA No. 3:16-cv-00322-CMC, 2016 WL 741317, at *2 (D.S.C. Feb. 25, 2016). A plaintiff must first prove the first two

---

[3] The court observes that "rule" refers to the Federal Rules of Civil Procedure.

elements before a court considers whether the balance of the equities tips in his favor. See Real Truth, 575 F.3d at 346–47. Additionally, the court pays particular attention to the public consequences of employing this extraordinary form of relief via injunction. Real Truth, 575 F.3d at 347 (citing Winter, 555 U.S. at 24).

20. "The traditional purpose of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of the lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." De La Fuenta, 2016 WL 741317, at *2.

B. Nutramax's Request for Relief

21. Nutramax seeks a preliminary injunction that: (a) enjoins NMLI "from infringing Plaintiff's registered trademarks in connection with its 'Steelcut Testosterone' and 'Muscle Boost XT' and trial offers of both, and any other products marketed, distributed, or sold . . ."; (b) enjoins NMLI "from making false and misleading statements of fact in connection with its 'Steelcut Testosterone' and 'Muscle Boost XT' and trial offers of both, and any other products marketed, distributed, or sold, . . ."; and (c) requires NMLI to "[i]mmediately take appropriate corrective actions to cure the misperceptions its false statements and trademark infringement have caused in the marketplace, by . . . [l]isting appropriate contact information on the Infringing Website and any other websites on which Defendant [NMLI] sells 'Steelcut Testosterone' and/or 'Muscle Boost XT'; and . . . [c]ontacting consumers of any trial offers for 'Steelcut Testosterone' and/or 'Muscle Boost XT' and informing them that Defendant [NMLI] is in no way affiliated with Plaintiff and providing them accurate contact information for Defendant [NMLI]; . . . ." (ECF No. 8 at 1–2.)

22. Additionally, Nutramax seeks an order requiring "Namecheap [to] immediately

transfer the domain name 'www.nutramax-labs-inc.com' to Plaintiff Nutramax, or, in the alternative, immediately disable the domain name 'www.nutramax-labs-inc.com.'" (Id.)

C.  The Court's Review

23. In support of its Motion for Preliminary Injunction, Nutramax relies on its Verified Complaint (ECF No. 1-1), a copy of a search document authenticating its Trademark Registration Number (ECF No. 8-2), a copy of a document demonstrating the search results for "nutramax" in the U.S.P.T.O. Trademark Electronic Search System (ECF No. 8-3) and consumer complaints filed with Nutramax's customer service department (ECF No. 8-4 at 4–10).

24. The court heard oral argument from Nutramax's counsel on October 10, 2017. (ECF No. 32.)  Even though Nutramax served NMLI with a copy of the Motion for Preliminary Injunction and Notice of the Hearing (ECF Nos. 9 & 31-1), NMLI did not appear at the October 10, 2017 hearing.

25. The court addresses below the vitality of Nutramax's assertions under each of the four requirements set forth in Winter and reiterated by the Fourth Circuit in Real Truth.

### III.  SPECIFIC FINDINGS AND CONCLUSIONS

A.  Clear Showing of Likely Success on the Merits

26. "[P]laintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits." Pashby v. Delia, 709 F.3d 307, 321 (4th Cir. 2013) (citing Winter, 555 U.S. at 20).  "Although this inquiry requires plaintiffs seeking injunctions to make a 'clear showing' that they are likely to succeed at trial, Real Truth, 575 F.3d at 345, plaintiffs need not show a certainty of success, see 11A Charles Alan Wright et al., Federal Practice & Procedure § 2948.3 (2d ed. 1995).  Pashby, 709 F.3d at 321.

27. Nutramax is likely to succeed on all of its claims alleging that NMLI has used and

continues to use the "Nutra Max" trademark without authorization in connection with its free trial scam.[4]

28. Specifically, Nutramax is likely to succeed on its trademark infringement[5] and false designation of origin claims because it is the exclusive owner of the Mark, which NMLI used in commerce and in connection with the sale of product in a manner likely to confuse consumers.[6] (ECF No. 8-1 at 11–16.)

29. Nutramax is likely to succeed on its trademark dilution claim[7] because its Mark is famous and has been diluted by NMLI's conduct. (Id. at 16–19.)

---

[4] "Free trial scam" refers to the phrase used in Nutramax's Memorandum in Support of Its Motion for a Preliminary Injunction. (ECF No. 8-1.)

[5] Because Nutramax is likely to be successful on its trademark infringement claim, it is also likely to be successful on its unfair trade practices claim "because the elements and proof of these claims are identical." (ECF No. 8-1 at 11 n.2 (citing Nat'l Van Lines, Inc. v. Nat'l Van Lines Inc., C/A No. 4:12-926-TLW, 2013 WL 2180739, at *6–7 (D.S.C. May 20, 2013) ("Under South Carolina law, proof of trademark infringement is sufficient to establish a violation under SCUTPA.")).)

[6] "Both infringement and false designation of origin have five elements." Lamparello v. Falwell, 420 F.3d 309, 313 (4th Cir. 2005). "To prevail under either cause of action, the trademark holder must prove: (1) that it possesses a mark; (2) that the [opposing party] used the mark; (3) that the [opposing party's] use of the mark occurred 'in commerce'; (4) that the [opposing party] used the mark 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services; and (5) that the [opposing party] used the mark in a manner likely to confuse consumers." Id. (citation omitted).

[7] The Trademark Dilution Revision Act of 2006 ("TDRA"), 15 U.S.C. § 1125(c), authorizes claims for trade dilution. The TDRA provides as follows:

> Subject to the principles of equity, the owner of a famous mark . . . shall be entitled to an injunction against another person who . . . commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury. 15 U.S.C.A. § 1125(c)(1) (emphasis added). A mark is "famous" when it is "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." Id. § 1125(c)(2)(A). Creating causes of action for only dilution by blurring and dilution by tarnishment, the TDRA defines "dilution by blurring" as the "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." Id. § 1125(c)(2)(B). It defines "dilution

30. Nutramax is likely to succeed on its claim alleging violation of the ACPA[8] because the Infringing Website was used by NMLI to profit from the good will associated with Nutramax's Mark. (Id. at 20–23.)

31. Finally, Nutramax is likely to succeed on its common law fraud[9] claim because all 9 elements are shown by NMLI's continued use of the Mark and its effects on consumers. (Id. at 23–24.)

B.  Likelihood of Suffering Irreparable Harm Absent an Injunction

32. Winter also requires that the party requesting injunctive relief demonstrate that it is likely it will suffer irreparable harm absent the preliminary injunction. 555 U.S. at 22–23. The harm to be prevented must be of an immediate nature and not simply a remote possibility. Am. Whitewater v. Tidwell, No. 8:09-cv-02665-JMC, 2010 WL 5019879, at *11 (D.S.C. Dec. 2, 2010) (citing In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 525 (4th Cir. 2003)).

---

by tarnishment" as the "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." Id. § 1125(c)(2)(C).

Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC, 507 F.3d 252, 264 (4th Cir. 2007). "[T] to state a dilution claim under the TDRA, a plaintiff must show: (1) that the plaintiff owns a famous mark that is distinctive; (2) that the defendant has commenced using a mark in commerce that allegedly is diluting the famous mark; (3) that a similarity between the defendant's mark and the famous mark gives rise to an association between the marks; and (4) that the association is likely to impair the distinctiveness of the famous mark or likely to harm the reputation of the famous mark." Id. at 264–65.

[8] "Under the Anticybersquatting Consumer Protection Act (ACPA), the owner of a protected mark has a cause of action 'against anyone who registers, traffics in, or uses a domain name that is identical or confusingly similar to [the owner's] trademark with the bad faith intent to profit from the good will associated with the trademark.'" Retail Servs., Inc. v. Freebies Publ'g, 364 F.3d 535, 549 (4th Cir. 2004) (quoting Hawes v. Network Sols., Inc., 337 F.3d 377, 383 (4th Cir. 2003)); see also 15 U.S.C. § 1125(d)(1).

[9] The elements of fraud under South Carolina law are: "(1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury." Cheney Bros., Inc. v. Batesville Casket Co., Inc., 47 F.3d 111, 114 (4th Cir. 1995).

33. "When analyzing the irreparable harm element, there are two inquiries: 1) whether the plaintiff is indeed suffering actual and imminent harm; and 2) whether that harm is truly irreparable, or whether it can be remedied at a later time with money damages." Sauer-Danfoss Co. v. Nianzhu Luo, C/A No. 8:12-3435-HMH, 2012 WL 6042831, at *1 (D.S.C. Dec. 5, 2012) (quoting First Quality Tissue SE, LLC v. Metso Paper USA, Inc., C/A No. 8:11-2457-TMC, 2011 WL 6122639, at *2 (D.S.C. Dec. 9, 2011)).

34. Upon its review, the court finds that Nutramax has clearly shown it will suffer irreparable harm in the event its Motion is denied.

35. Nutramax's irreparable harm is demonstrated by the fact that NMLI's conduct has misled customers. (ECF No. 8-1 at 25.) Unless a preliminary injunction is granted that prohibits NMLI from using Nutramax's registered trademarks, NMLI will continue to use Nutramax's Mark to deceive customers into believing that Nutramax is the entity behind the free trial scam. Such conduct has caused and is likely to cause Nutramax irreparable harm.

36. "[P]roof of actual consumer deception alone is sufficient for a showing of irreparable harm." (Id. (citing PBM Prod., LLC v. Mead Johnson, Co., 639 F.3d 111, 126 (4th Cir. 2011) (holding irreparable harm element satisfied "primarily on the fact that [defendant's] advertising misled customers.")).) Moreover, irreparable harm is presumed "where a party is likely to succeed on claims of trademark infringement." (Id. (citing Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc., 43 F.3d 922, 939 (4th Cir. 1995) ("Infringement gives rise to irreparable injury, in that plaintiff has lost control of its business reputation to this extent, there is substantial likelihood of confusion of the purchasing public, there may be no monetary recovery available, and there is an inherent injury to the good will and reputation of the plaintiff.")).)

37. In consideration of the foregoing, the court is able to infer both the actuality and

imminency of the irreparable harm suffered by Nutramax.

38. To demonstrate a need for injunctive relief, a plaintiff must show how the harm suffered is such that other forms of damages available in the normal course of litigation are not enough. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough," because of the "the possibility that adequate compensatory or other corrective relief will be available at a later date." Hughes Network Sys. v. Interdigital Commc'ns Corp., 17 F.3d 691, 694 (4th Cir. 1994). This "weighs heavily against a claim of irreparable harm." Id.

39. "A preliminary injunction is not normally available where the harm at issue can be remedied by money damages." Bethesda Softworks, LLC v. Interplay Entm't Corp., 452 F. App'x 351, 353 (4th Cir. 2011).[10]

40. In the context of this matter, the court is persuaded that the continued infringement on its Mark causing actual customer confusion cannot be remedied by money damages. In this regard, the court finds that money damages in the instant case would not be adequate based on the current evidence of record.

C. The Balance of Equities and the Public Interest Factors

41. Generally, in determining whether to grant a motion for injunctive relief, "[t]he court must also consider the balance of hardships between the litigants and the impact on the

---

[10] The presumption against issuing preliminary injunctions where a harm suffered can be remedied by money damages at judgment stems from real concerns the issuance of a preliminary injunction remedy raises. These concerns include, for example, the fact that in issuing a preliminary injunction order, a district court is required, based on an incomplete record, to order a party to act in a certain way. Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp., 17 F.3d 691, 694 (4th Cir. 1994). Issuing an injunction further risks repetitive litigation, that which carries significant costs for both parties. Id. Thus, there are only "extraordinary circumstances" that are "quite narrow" in application, where preliminary injunction is appropriate notwithstanding monetary damages. Id. (discussing a Plaintiff's business not being able to survive as an example of such circumstances.)

public at large prior to issuing an injunction." Uhlig, LLC v. Shirley, C/A No. 6:08-cv-01208-JMC, 2012 WL 2458062, at *4 (D.S.C. June 27, 2012).

42. Above, the court found that Nutramax will suffer irreparable harm without an injunction. Alternatively, there is no evidence that NMLI will suffer any harm if Nutramax's Motion is granted.

43. The balance of equities tips in Nutramax's favor because on one hand it has "invested millions of dollars and significant time and effort in advertising, promoting, and developing its trademarks, and establishing substantial goodwill in its intellectual property, including the Mark." (ECF No. 8-1 at 26.) "On the other hand, Defendant [NMLI]'s unauthorized use of Nutramax's registered Mark is a calculated and purposeful attempt to confuse consumers into thinking that Nutramax, rather than Defendant [NMLI], is the entity behind the Defendant's free trial scams." (Id. at 26–27.) In this regard, NMLI "has no equitable interest in perpetuating false claims regarding the origin of its products" (id. at 27) and its alleged scam to defraud consumers is not deserving of any legal protection.

44. Finally, an injunction is in the public interest because it would "prevent customer confusion in the marketplace" and ensures that "manufacturers accurately represent their products." (ECF No. 8-1 at 27 (citing, e.g., Augusta Nat'l, Inc. v. Exec. Golf Mgmt., Inc., 996 F. Supp. 492, 499 (D.S.C. 1998) ("The right of the public to be free from the deception that results from a defendant's use of a plaintiff's trademark is transcendent.")).) Without an injunction preventing NMLI from using Nutramax's registered Mark, consumers do not know the entity behind the free trial scam and have no ability to seek redress for the harm they have suffered.

45. Accordingly, the court finds that granting Nutramax injunctive relief is in the public's interest.

D.  Required Posting of Bond

46. Rule 65 provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

47. After considering the circumstances alleged in instant Motion, the court will require Nutramax to post a modest bond of one thousand dollars ($1,000.00) to take advantage of the relief granted in this Order. See Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 421 (4th Cir. 1999) (acknowledging the requirement that a district court set an injunction bond and also acknowledging that the court can set the bond "in such sum as the court deems proper").

## IV. CONCLUSION

48. Having found that Nutramax has satisfied all of the requirements for preliminary injunctive relief, the court **GRANTS** Plaintiff Nutramax Laboratories, Inc.'s Motion for Preliminary Injunction (ECF No. 8). The court **ORDERS, ENJOINS AND RESTRAINS** Defendant Nutra Max Labs Inc, its agents, divisions, subsidiaries, officers, agents, employees, attorneys, and all those persons in active concert or participation with it, including any person or entity marketing, advertising, selling, offering for sale or free trial, or distributing its products, from directly or indirectly using Nutramax Laboratories, Inc.'s registered trademarks in connection with Nutra Max Labs Inc's Steelcut Testosterone and Muscle Boost XT products and the trial offers of both, and any other products marketed, distributed, or sold by Nutra Max Labs Inc, including but not limited to any form of "Nutra Max," "Nutramax Labs Inc," "Nutra Max Inc" and "Nutra Max Labs Inc" and the Mark identified in the Verified Complaint and any other terms or phrases that are confusingly similar to the Mark; and further **ORDERS** Nutra Max Labs

Inc to immediately take appropriate corrective actions to cure the misperceptions its false statements and trademark infringement have caused in the marketplace, by: (1) listing appropriate contact information on the Nutra Max Labs Inc website and any other websites on which it sells, offers for sale or free trial, markets, advertises, or distributes Steelcut Testosterone and/or Muscle Boost XT products; and (2) contacting consumers of any trial offers for Steelcut Testosterone and/or Muscle Boost XT products and informing them that Nutra Max Labs Inc is in no way affiliated with Nutramax Laboratories, Inc. and providing them accurate contact information for Nutra Max Labs Inc.

49. In furtherance of the aforementioned Preliminary Injunction, the court further **ORDERS** Namecheap, Inc. d/b/a WhoisGuard to immediately transfer the domain www.nutramax-labs-inc.com to Plaintiff Nutramax Laboratories, Inc. until further notice.

50. The preliminary injunction will become effective upon Nutramax's posting of the required one thousand dollars ($1,000.00) security/bond with the Clerk of Court. The Clerk of Court is directed to place any funds received from Nutramax in a non-interest-bearing account.

**IT IS SO ORDERED.**

*J. Michelle Childs*
United States District Judge

October 20, 2017
Columbia, South Carolina